**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| **AMY D. FRANCISCO,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL NO. 3:09cv737-DWD** |
| ) | |
| **VERIZON SOUTH, INC.,** ) | |
| ) | |
| **Defendant.** ) | |

## <u>MEMORANDUM OPINION</u>

This matter is before the Court by consent of the parties pursuant to 28 U.S.C. § 636(c)(1)

on Plaintiff's motion for sanctions (Docket No. 41); Plaintiff's motion to strike exhibits 3, 4, and

10 of Defendant's motion for summary judgment (Docket No. 43); Plaintiff's motion to strike

the declaration of Kenna Ashley (Docket No. 56); Defendant's motion for leave to file a second

amended answer (Docket No. 39); Defendant's motion for a protective order (Docket No. 49);

Defendant's motion in limine (Docket No. 62); and Defendant's motion for summary judgment

(Docket No. 37).  All pending motions have been fully briefed and the Court has entertained oral

argument.  For the reasons discussed herein, the Court hereby DENIES Plaintiff's motion for

sanctions, Plaintiff's motion to strike exhibits, Defendant's motion for a protective order, and

Defendant's motion in limine.  The Court hereby GRANTS Defendant's motion for leave to

amend its answer and Defendant's motion for summary judgment.[1]

---

[1]The Defendant's motion in limine has no bearing on the record before the Court for
summary judgment purposes.  Because the Court grants Verizon's motion for summary
judgment, the Court denies the motion in limine as moot.

# I. NON-DISPOSITIVE MOTIONS

Because the motions present a number of non-dispositive evidentiary and pleading issues that may bear on the resolution of the Defendant's motion for summary judgment, the Court begins its analysis with the non-dispositive motions.

## A.     Background of the Case

Amy D. Francisco ("Francisco" or "Plaintiff") brings this action alleging unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981 by her former employer, Verizon South, Inc. ("Verizon" or "Defendant"), after she had complained about incidents of racial discrimination at work. (Am. Compl. ¶ 1.) Specifically, Francisco, an African-American woman, alleges that Verizon: (1) unlawfully retaliated against her by giving her poor performance ratings after she inquired about the discrepancy between the company pay scale and her actual salary (Am. Compl. ¶ 24); (2) subjected her to a display of a photograph of a noose during a company meeting ("the Noose Incident") (Am. Compl. ¶¶ 26, 30-33, 36); and (3) unlawfully terminated her after she requested an investigation of the Noose Incident (Am. Compl. ¶¶ 36, 45-47).

The case has proceeded through contentious discovery, eliciting several evidentiary motions disputing the appropriate record for consideration in resolving the Defendant's motion for summary judgment. The Plaintiff has filed a motion for sanctions based on allegations of attorney misconduct at a deposition, as well as two motions to strike declaration and other evidence. The Defendant has countered by filing a motion for leave to amend its answer and a motion for a protective order to retrieve or "claw-back" an allegedly privileged document that had been produced in discovery.

**B.      Resolution of Non-Dispositive Motions**

**(1)      Motion for Sanctions**

Francisco alleges that Verizon's counsel interfered with Francisco's deposition of Louise Shutler ("Shutler").  During the deposition, Shutler explained how she had interviewed Francisco about the Noose Incident.  Counsel for Francisco then began to ask about what, if any, details Shutler related to Ashley, Nuckles, or others at Verizon.  Shutler states that she received all of her information about the Noose Incident from Francisco, but later stated that "information would have come from Ms. Nuckles."  (Shutler Dep. at 156:10-157:22.)  In such a context, it appears that Shutler either misspoke, or that she testified about having received the information from a different source.  The source and timing of such information is significant because the timing of when Francisco's superiors knew about her complaint concerning the Noose Incident is relevant to the issue of causation.

Counsel for Verizon interrupted the deposition, noting that she believed that Shutler had misspoken, and asked her to clarify.  (Id. at 158:3-6.)  Shutler agreed that she misspoke, then testified that she meant that Francisco, not Nuckles, had provided the relevant information.  (Id. at 158:7-8.)  Counsel for both parties then engaged in a heated exchange in which counsel for Francisco accused Verizon's counsel of coaching the witness, with counsel then accusing the witness of changing her testimony to conform to her attorney's coaching.  (Id. at 159:1-160:13.)

A court may impose an appropriate sanction, including the reasonable expenses and attorney's fees incurred by any party, on a person who impedes, delays, or frustrates the fair examination of a deponent.  *Fed. R. Civ. P.* 30(d)(2).  Although Rule 30(d)(2) does not define the phrase "appropriate sanction," the imposition of discovery sanctions is generally within the

sound discretion of the trial court.  <u>Nat'l Hockey League v. Metro. Hockey Club, Inc.</u>, 427, U.S. 639, 642 (1976)**;** <u>GMAC Bank v. HTFC Corp.</u>, 248 F.R.D. 182, 185 n.4 (E.D. Pa. 2008). Although counsel who is defending a deposition may prepare a witness, once the deposition begins, "[t]here is no proper need for the witness's own lawyer to act as an intermediary, interpreting questions, deciding which questions the witness should answer, and helping the witness to formulate answers."  <u>Hall v. Clifton Precision</u>, 150 F.R.D. 525, 528 (E.D. Pa. 1993).

However, Francisco fails to show that Verizon's counsel, Ms. Connolly, "impede[d], delay[ed], or frustrate[d] the fair examination of the deponent." *Fed. R. Civ. P.* 30(d)(2).  There is no record of "blatant, on-the-record witness coaching," as Francisco argues.  (Pl.'s Br. at 3.) While it may have been more prudent for counsel to correct the record during cross-examination, it may also be appropriate for counsel to correct the record in context, as Ms. Connolly did here.

The Court takes no position as to whether the timing of counsel's efforts to clarify the record were appropriate or ill-advised.  However, they do not rise to the level of impeding, delaying, or frustrating the deposition in any event.  Fed. R. Civ. P. 30(d)(2).  Indeed, counsel's actions did not amount to coaching the witness because her effort to correct the record occurred *after* the witness answered the subject question.  Accordingly, Francisco had both the "un-coached" answer on the record, as well as the allegedly "coached" answer.

Inconsistent testimony, if any, is relevant only as concerns the weight of a witness's statements, and witnesses are to be given an opportunity to explain the inconsistency, as occurred here.  <u>See</u> Fed. R. Evid. 613(b).  Verizon's counsel did not terminate the deposition, instruct the witness not to answer the question, or assert a "speaking objection" prior to the witness's answer. Therefore, the Court declines to exercise its discretion to sanction Verizon, or counsel, for

counsel's part in the tepid exchange.

**(2)     Motion to Strike**

Francisco also challenges the admissibility, on summary judgment, of portions of declaration evidence that Verizon submitted in support of its motion for summary judgment. Specifically, Francisco argues that certain portions of the Nuckles and Ashley declarations constitute inadmissible hearsay.  As to Ashley's second post-deposition declaration, Francisco also alleges that it constitutes "refreshed recollection" using undisclosed, privileged documents without it having complied with Fed. R. Evid. 612.  Moreover, Francisco seeks to strike the declarations as "sham" declarations because they allegedly contradict prior testimony.  Finally, Francisco challenges the admissibility of employment records received from another employer of Francisco (Kohl's Department Store), arguing that the documentation consists of hearsay and is otherwise unauthenticated.

The resolution of evidentiary issues is within the court's sound discretion, including any involving affidavit evidence submitted at the summary judgment stage.  Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996) (citing United States v. Hassan El, 5 F.3d 726, 731 (4th Cir. 1993).  Of course, a court must apply the applicable rules of evidence when exercising such discretion.  Id.  Affidavits submitted in support of, or in opposition to, a motion for summary judgment must "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e); see Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996).  Hearsay evidence, inadmissible at trial, is likewise insufficient to support a motion for summary judgment.  Maryland Highways Contractors Ass'n, Inc. v. State of Maryland, 933

F.2d 1246, 1251 (4th Cir. 1991).  Generally, "unsworn, unauthenticated documents cannot be considered on a motion for summary judgment."  Orsi v. Kirkwood, 999 F.2d 86, 92 (4th Cir. 1993) (citations omitted).

(a)     **Nuckles Declaration**

Francisco argues that paragraphs 12, 22, 23, 25, and 33 of the Nuckles Declaration constitute inadmissible hearsay.  "Hearsay" is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801(c).  A statement of someone other than the testifying witness is inadmissible hearsay only if offered to "prove the truth of the matter asserted."  United States v. Vidacak, 553 F.3d 344, 353 (4th Cir. 2009).  Introducing statements for only the purpose of demonstrating that such statements were, indeed, spoken, is a purpose distinct from that of proving the truth of the content thereof.  Id. (citing Anderson v. United States, 417 U.S. 211, 219-20 (1974)).  Such a premise includes statements only offered to describe a person's state of mind, or to explain why a person acted in a particular way.  See United States v. Love, 767 F.2d 1052, 1063-64 (4th Cir. 1985).

Here, the contents of paragraph 12 of the Nuckles Declaration do not fall within the basic definition of hearsay.  Paragraph 12 does not reference any statement by anyone; rather, it asserts only that Francisco received certain training in her employment with Verizon.  As Francisco's direct supervisor, it was within the scope of Nuckles' employment duties and responsibilities to know what training programs that Francisco participated in, if any.  Although some of Francisco's training presumably occurred prior to Nuckles' employment with Verizon, it was still well within Nuckles' employment responsibilities to become familiar with Francisco's

qualifications, including her training, and, therefore, she had first hand knowledge of the information. Indeed, Francisco's supplemental exhibits in opposition to the motion for summary judgment corroborate Nuckles' familiarity with Francisco's training history. (See Pl.'s Suppl. Exs. at Ex. 2, page 1.)

As to the conversations referenced in paragraphs 22, 23, 25, and 33, none of the statements by Don Albert ("Albert"), JoAnn Clements ("Clements"), or others at Verizon are offered for the truth of the matters set forth therein. Such statements are offered only to demonstrate that they were, in fact, uttered and to explain why Nuckles acted the way that she did with respect to Francisco (i.e. commencing an investigation about Francisco's whereabouts; explaining the RIF to Francisco; etc.) Thus, none of the statements in Nuckles' declaration constitute hearsay.

As to Francisco's claim that Nuckles' declaration is a "sham," the Court first notes that a motion to strike such a declaration is typically a procedure invoked by the party moving for summary judgment. See, e.g., Rohrbough v. Wyeth Labs, Inc., 916 F.2d 970, 976 (4th Cir. 1990); Barwick v. Celotex Corp., 736 F.2d 946, 959-60 (4th Cir. 1984); Stith v. Thorne, 247 F.R.D. 89, 93 (E.D. Va. 2007). That is because the non-moving party does not need to make such a motion where any genuine issues of material fact are viewed in the light most favorable to the non-moving party in any event. Anderson, 477 U.S. at 255. Regardless, if declaration testimony submitted at the summary judgment stage contradicts the declarant's own deposition testimony, the Court still cannot consider it for purposes of resolving summary judgment.

Here, however, the Court does not find any inconsistencies between Nuckles' declaration and her deposition testimony. Indeed, Nuckles testified at deposition that the decisions

concerning Francisco's employment were made "very early in the year, perhaps in the month of January. (Nuckles Dep. 212:14-25.) Likewise, her declaration states that "[*i*]*n early January of 2008*" she learned that Albert had made the initial decision to terminate Francisco. (Nuckles Decl. ¶ 22 (emphasis added).) Thus, the relevant time frames are consistent in both her deposition and her declaration, and the Court will therefore consider such evidence as part of the record in resolving Defendant's motion for summary judgment.

Apparently in an effort to create additional inconsistencies, Francisco emphasizes Nuckles' testimony that she is not "privy to" the specific date in January in which the decision to terminate Francisco was finalized. (Pl.'s Br. at 6; Nuckles Dep. at 226:6-16.) Nuckles explains that while she was not privy to the official decision-making process conducted by Albert, she was nevertheless involved in a *separate* discussion in which she learned of his decision and in which she had provided her input. (Compare Nuckles Decl. ¶ 22 with Nuckles Dep. at 212:24-25.) Both Nuckles' declaration and deposition indicate that such a separate discussion occurred in the early January time frame. (Id.) The Nuckles deposition testimony is therefore consistent with her subsequent declaration. (Nuckles Decl. at ¶ 22.)

For all these reasons, the Court will not strike Nuckles' declaration submitted in support of Verizon's motion for summary judgment. However, as with all evidence provided by the moving party, any inconsistencies shall be resolved in favor of the non-moving party for purposes of resolving the motion for summary judgment.

### (b) Ashley's First Post-Deposition Declaration

Francisco similarly seeks to strike Ashley's first post-deposition declaration as a "sham" declaration due to alleged inconsistencies. As with Nuckles' declaration, the Court percieves no

material inconsistencies, and, therefore, will not strike the subject declaration testimony.

Initially, Francisco refers to the cryptic, handwritten note shown to Ashley as "Exhibit 8" of her deposition to establish that Ashley knew about Francisco's pending termination as early as March 6, 2008. (Pl.'s Br. Supp. Mot. Strike at 9.) According to Francisco, the note contradicts Ashley's declaration in which she stated that she first informed Albert about the Noose Incident on March 11, 2008. (Ashley Decl. ¶ 8.) However, the note is no more than a cryptic, almost meaningless series of shorthand notes marked "3/6/0." (Pl.'s Br. Supp. Mot. Strike at Ex. 3.) Ashley offered no testimony "authenticating" the documents, short of agreeing that she authored the notes. She could not, however, recall the date on which she did so. (Ashley Dep. 138:5-10.) Given the cryptic nature of the notes, they are simply meaningless. They do not indicate that Ashley knew about the RIF on any particular date, and they do not reference any conversation with Albert.

Secondly, Francisco notes an email from Shutler to Ashley dated February 13, 2008, to argue that the February 18, 2008 date stated in Ashley's declaration constitutes an inconsistent position. (Compare Pl.'s Br. Supp. Mot. Strike Ex. 4 with Ashley Decl. ¶ 4.) However, there is no inconsistency between those dates because they reference different events. The email indicates that Ashley *learned* about Francisco's allegations about the Noose Incident at least as early as February 13, 2008. Ashley's declaration instead states that "[o]n or around February 18, 2008, [Ashley] was *assigned* the task of investigating [the Noose Incident]." (Ashley Decl. ¶ 4 (emphasis added).) The email is consistent with Ashley's declaration because there is a distinction between when Ashley *learned* about the Noose Incident, and when she was *assigned* to investigate same.

Because Ashley's deposition testimony is consistent with the statements in her declaration, the Court will not strike the declaration.

### (c)    Ashley's Second Post-Deposition Declaration

Ashley's second post-deposition declaration was filed in support of Verizon's motion for a protective order, and is not part of the record supporting summary judgment.[2]  Because the Court denies Verizon's motion for a protective order and grants its motion for summary judgment, regardless of whether it considers Ashley's second post-deposition declaration, the motion to strike the declaration is denied as moot.

### (d)    Kohl's Department Store Records

Francisco challenges the Kohl's Department Store Records (Ex. 4 to Def.'s Mot. Summary Judgment.), arguing that they are not properly authenticated.  (Pl.'s Br. Supp. Mot. Strike at 5.)  In order to authenticate a document, Fed. R. Evid. 901 requires "evidence sufficient to support a finding that the matter in question is what its proponent claims."  The Rule provides several, non-limiting illustrations, including the traditional method of authentication by way of witness testimony.  Fed. R. Evid. 901(b)(1).  Such requirements should not "make technical minefields of summary judgment," but they should also not "unfairly surprise the other with evidence that the other has not had time to consider."  Orsi v. Kirkwood, 999 F.2d 86, 91 (4th Cir. 1993).

Under the circumstances here, the Kohl's records are sufficiently authenticated pursuant

---

[2]Francisco asserts that Ashley's second post-deposition declaration is offered in support of Verizon's motion for summary judgment.  However, the declaration is not attached in support of the motion for summary judgment, and the Court considers it, if at all, solely in support of Verizon's motion for a protective order.

to Fed. R. Evid. 901. Such authentication may be sufficient based on extrinsic evidence, as well as "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." See Fed. R. Evid. 901(b)(4); see also, Williams v. Long, 585 F. Supp. 2d 679, 685 (D. Md. 2008). Verizon has submitted both the cover letter from Kohl's Department Stores, on Kohl's letterhead, as well as a copy of the subpoena in response to which Kohl's produced the subject records. There is no indicia that the documents are not what Verizon, the subpoena, or the cover letter asserts that they are -- Kohl's employment records for Amy D. Francisco. Indeed, Francisco has been in possession of the documents since May 2010, including the cover letter from Kohl's legal division, but she has not heretofore voiced objection or otherwise challenged the authenticity of the records. Moreover, Francisco's own testimony admitting her employment with Kohl's corroborates the very records that she now challenges as insufficiently reliable. (See Francisco Dep. 189-91, 244-45.)

Accordingly, the documents are sufficiently authenticated, and the Court will not strike them.

### (3) Motion for Leave to Amend

Verizon seeks leave to amend its Amended Answer at paragraphs 30 and 42 to conform to deposition testimony given during discovery, arguing that the facts admitted by the paragraphs of its Amended Answer are imprecise, as revealed in the course of subsequent discovery. In essence, Verizon seeks to simply clarify its admissions, but not substantively change its answers.

Pursuant to Fed. R. Civ. P. 15(a)(2), once a responsive pleading has been filed to an initial pleading, "a party may amend its pleading only with the opposing party's written consent or the court's leave." In considering a request for leave to amend, "[t]he court should freely give

leave when justice so requires." Id. The language of the Rule has been construed to counsel a liberal reading of its application. Harless v. CSX Hotels, Inc., 389 F.3d 444, 447 (4th Cir. 2004). "Motions to amend are typically granted in the absence of an improper motive, such as undue delay, bad faith, or repeated failure to cure a deficiency by amendments previously allowed." Id. (citing Ward Elec. Serv., Inc. v. First Commercial Bank, 819 F.2d 496, 497 (4th Cir. 1987)). A lack of prejudice to the nonmoving party, alone, ordinarily warrants granting leave to amend. Ward Elec. Serv., 819 F.2d at 497. Furthermore, within the guidelines of Rule 15, "[t]he disposition of a motion to amend is within the sound discretion of the district court." Davis v. Virginia Commonwealth Univ., 180 F.3d 626, 628 (4th Cir. 1999) (citing Foman v. Davis, 371 U.S. 178 (1962)).

Paragraph 30 of the Amended Complaint alleges that, during an exercise at a Verizon management conference, McNeil displayed a card toward the audience of employees depicting a photograph of a noose. However, Albert testified at his deposition on April 14, 2010, that McNeil's role in the exercise was only to exhibit cards with sound commands to the audience, e.g., "applause," and then to "ceremoniously discard" them. According to Albert, one of the cards contained a "ClipArt" image of a noose, which was utilized at a previous management meeting that incorporated a theme from the play *The Phantom of the Opera*. Based on his deposition testimony, Verizon seeks to amend its Answer to simply "admit" only that, when McNeil discarded one of the cards, "the wrong side was exposed revealing the image of a noose on the reverse side." (Def.'s Br. Supp. Mot. Leave at 5.) In essence, Verizon wants to address and correct two inaccuracies in paragraph 30 of its Amended Answer: (1) the noose was a "ClipArt" image, not a photograph; and (2) McNeil did not hold the card toward the audience,

12

but inadvertently revealed the noose image on the reverse side when she  the card.

Paragraph 42 of the Amended Complaint alleges that Shutler forgot to refer Francisco's concerns to the "Ethics Group," but promised to immediately refer it to "local management." Indeed, Shutler admitted during her subsequent deposition that she had referred Francisco's concerns to Keena Ashley ("Ashley"), an employee of the EEO Compliance Office. Understandably believing that "local management" might include the "Ethics Group" or the EEO Compliance Office,  Verizon initially admitted the allegations in Paragraph 42.  During Shutler's deposition, however, Verizon became aware that Francisco's reference to "local management" was instead intended to reference Francisco's direct supervisors.  Now realizing that its response in paragraph 42 of its Amended Answer is inaccurate, Verizon wishes to amend it to conform to Shutler's deposition testimony.

Francisco characterizes Verizon's motion for leave to amend as a "*post-facto* effort to mold the evidence in its favor."  (Pl.'s Br. Opp'n Mot. Leave at 2.)  She argues that the Court should deny the motion, asserting that Verizon is "guilty of undue delay and bad faith" by failing to request leave as soon as it learned of the factual discrepancies at issue.  (Id.)  Specifically, she notes that Verizon seeks amendment of paragraph 30 more than four (4) months after Albert revealed the discrepancy in his deposition testimony.  Moreover, Francisco argues that she will suffer prejudice because discovery is now closed, and, as a result, she cannot "probe Verizon's new depiction of how the noose was displayed."  (Id. at 4.)

Aside from Francisco's allegation that Verizon is "mold[ing] the evidence better to fit its arguments," she makes no showing of bad faith on Verizon's part.  Amending a pleading does not change the deposition testimony, but conforms the pleading to the already established

evidence.  Likewise, her allegations of "undue delay" are without merit.  Verizon asserts, and the Court accepts, that it first noticed the discrepancy in paragraph 30 during its preparations for its motion for summary judgment.  Moreover, Francisco deposed Shutler a mere three (3) weeks prior to Verizon filing the instant motion.

Finally, Francisco fails to show that she will suffer any prejudice if the Court grants Verizon's motion for leave to amend.  The facts upon which Verizon bases its proposed amendments were disclosed during Francisco's depositions of Albert and Shutler.  (Shutler Dep. at 142:1-144:14; Albert Dep. at 245:2-21.)  Thus, Francisco had ample opportunity to question those witnesses about their statements and develop the facts.  Verizon is not changing these *facts* by its proposed amendments.  Nor is it raising new facts or legal theories of which Francisco is not yet aware.  Rather, Verizon seeks to simply conform its *pleading* to facts which were revealed during discovery.  It is also notable that Verizon does not now seek to deny the allegations in paragraphs 30 and 42 of the Amended Complaint, but merely seeks to clarify its admissions thereto.[3]

Finding no undue delay, bad faith, or prejudice, the Court will grant Verizon's motion for leave to file its Second Amended Answer.

**(4)     Motion for a Protective Order**

Verizon seeks a protective order precluding any further use of the handwritten notes produced in discovery and attached as Exhibit 8 to Francisco's opposition to Verizon's motion

---

[3]As Verizon correctly notes, it could have similarly amended its pleading to conform to the evidence at trial in accordance with Fed. R. Civ. P. 15(b).  Francisco does not address that additional argument.  Indeed, she is less likely to suffer prejudice as a result of Verizon's decision to amend its pleadings at this juncture, as opposed to during trial.

for summary judgment. Verizon argues that the notes were written during a confidential

conversation between Ashley and Verizon's general counsel, but that counsel did not realize that

circumstance until Ashley reviewed certain other privileged documents on August 31, 2010.

Thus, Verizon produced the notes, redacting non-responsive portions and stamping it

"CONFIDENTIAL" pursuant to the agreed protective order.[4]

Fed. R. Civ. P. 26 "confers broad discretion on the trial court to decide when a protective

order is appropriate and what degree of protection is required." Seattle Times Co. v. Rhinehart,

467 U.S. 20, 36 (1984); see also M & M Medical Supplies & Serv., Inc. v. Pleasant Valley

Hosp., Inc., 981 F.2d 160, 163 (4th Cir. 1992). The attorney-client privilege "rests on the need

for the advocate and counselor to know all that relates to the client's reasons for seeking

representation if the professional mission is to be carried out." Trammel v. United States, 445

U.S. 40, 51 (1980). "When the privilege applies, it affords confidential communications between

lawyer and client complete protection from disclosure." Hawkins v. Stables, 148 F.3d 379, 383

(4th Cir. 1998). However, the voluntary production of a privileged document to a third party

waives the privilege. New Bank of New England v. Marine Midland Realty Corp., 138 F.R.D.

479, 482 (E.D. Va. 1991).

"Waivers must typically be intentional or knowing acts. Inadvertent disclosures are, by

definition, unintentional acts." Id. However, an "inadvertent disclosure may constitute a waiver

---

[4]Verizon also submitted three additional privileged documents for *in camera* review in
support of its claim that the handwritten notes were generated as part of a privileged
communication. Francisco argues that because Verizon used the privileged documents to refresh
Ashley's recollection in advance of her declaration, Fed. R. Evid. 612 now mandates the
production of the otherwise privileged documents. However, Francisco has made no motion to
such an effect, and, accordingly, the Court declines to address the issue.

of the privilege where the circumstances of the disclosure reflect gross negligence or a failure to take *reasonable precautions* to avoid the disclosure." Id. (emphasis added). To determine whether inadvertent disclosure waives the privilege, the Court considers five factors: (1) the reasonableness of the precautions to prevent inadvertent disclosure; (2) the time taken to rectify the error; (3) the scope of the discovery; (4) the extent of the disclosure; and (5) the overriding issue of fairness. See Id. (citations omitted).

As a preliminary matter, however, the question here is whether Verizon's disclosure of the handwritten notes at issue was, indeed, inadvertent. Few cases in the Fourth Circuit address what constitutes inadvertent disclosures, or even explicitly define the term "inadvertent." See Sterling v. Tenet, 416 F.3d 338 (4th Cir. 2006); Sandberg v. Virginia Bankshares, 972 F.2d 332 (4th Cir. 1993); Watson v. Lowcountry Red Cross, 974 F.2d 482 (4th Cir. 1992); United States v. (Under Seal), 794 F.2d 920 (4th Cir. 2986); Greitzer & Locks v. Johns-Manville Corp., Case No. 81-1379, 1982 U.S. App. LEXIS 21211 (4th Cir. March 5, 1982). However, Black's Law Dictionary defines the term "inadvertence" to mean "[a]n accidental oversight; a result of carelessness." Black's Law Dictionary, 774 (8th ed. 2004).

Nevertheless, one unpublished district court opinion from this Court's circuit offers some insight into the meaning of the phrase "inadvertent disclosure." In McCafferty's, Inc. v. Bank of Glen Burnie, Case No. MJG-96-3656, 1998 U.S. Dist. LEXIS 12861 (April 23, 1998), the court examined whether privileged information, in the possession of a third party over some time, had been inadvertently disclosed. The party entitled to the privilege did nothing to assert the privilege until the document became a noteworthy piece of evidence during litigation. The court explained:

> [T]here is a distinction between a long term failure to maintain confidentiality and a one shot inadvertent waiver of a privilege. An inadvertent waiver would occur when a document, which a party intended to maintain confidential, was disclosed by accident such as a *misaddressed communication* to someone outside the privilege scope or the inadvertent *inclusion of a privileged document with a group of nonprivileged documents* being produced in discovery. In contrast, when a client makes a decision -- albeit an unwise, or even mistaken, decision -- not to maintain confidentiality in a document, the privilege is lost due to an overall failure to maintain a confidence.

Id. at *4 - *5 (emphasis added).

Here, Verizon did not accidentally include a single document, known to be privileged, in a large collection of otherwise non-privileged documents. Rather, it intentionally, and after apparent analysis, determined that the notes at issue were to be marked confidential, redacted, and produced along with 170 additional pages of documents. (Pl.'s Br. Opp. Mot. Prot. Order. at 7.) Verizon knew that it was producing the document, but at that time, it had no reason to believe that the notes were privileged. As counsel for Verizon indicated at oral argument, only after a more extensive, second investigation did Verizon realize that the subject document might be privileged.

Ashley did not mark the document with any indicia that it reflected a conversation with counsel. Nor did she recall the context of the notes during her deposition. Indeed, counsel for Verizon had the opportunity to examine the document during three separate depositions, and yet counsel never objected that the notes were privileged. Under such circumstances, it does not appear that Verizon's disclosure of the document was "inadvertent."

Moreover, even if the Court concluded that the disclosure was "inadvertent," the Court would still conclude that Verizon did not take sufficient precautions to prevent the disclosure. The document itself was not marked with any indicia of privilege, such as a notation that the

notes reflected a conversation with counsel.  Moreover, the notes were discovered, not in the

EEO file, but in a separate file marked with Francisco's name.  (Def.'s Br. Opp'n Mot. Strike

Def.'s Exs. 3, 4, and 10 at 12, n.3.)  Indeed, no precautions were taken to protect the privilege

until the day that Verizon filed the present motion for a protective order.

It would also be unfair, at this juncture, to preclude Francisco's further use of the

document.  While the notes themselves are cryptic, and for the Court, meaningless, as previously

discussed, counsel for Francisco has referred to the notes as a "smoking gun," and has deposed

three different witnesses about their contents.  (Marshen Dep. at 50:13; Ashley Dep. at 137-38;

Albert Dep. at 253:1-25.)  Verizon did not raise the issue of privilege during any of the three

subject depositions, leading Francisco to rely heavily on the note in building her case --

particularly in her opposition to the Defendant's motion for summary judgment.

Although the Court appreciates the difficult position in which Verizon finds itself, it will

not issue the requested protective order.  Assuming that the notes in question were, indeed,

privileged material, any such privilege has been waived.[5]  Therefore, the Court denies Verizon's

motion for a protective order.

## II. Motion for Summary Judgment

### A.    Undisputed Material Facts

The parties have submitted their respective statements of undisputed material facts

---

[5]Francisco also contests whether the notes are, in fact, privileged under the "classic test."
See United States v. Jones, 696 F.2d 1069, 1072 (4th Cir. 1982) (citation omitted).  The Court
has reviewed, *in camera*, evidence submitted by Verizon in support of its privilege claim and
finds that the notes were, in all likelihood, generated as part of a privileged communication.  See
King Pharms., Inc. v. Purdue Pharma L.P., Case No. 1:08cv50, 2010 U.S. Dist. LEXIS 54407
(W.D. Va. June 2, 2010).  However, because the Court concludes that the privilege, if any, has
been waived, it need not address the point.

pursuant to the Court's Local Rules, and the Court has reviewed the statements, including the references to supporting evidence. Resolving all genuine disputes of material fact in favor of Francisco as the non-moving party, and disregarding those factual assertions that are not material, the Court has concluded that the following narrative represents the undisputed material facts for purposes of resolving the Defendant's motion for summary judgment.

Francisco began working for a predecessor of Verizon South (GTE) in 1988 as an associate. (Amended Complaint ¶ 9; Amended Answer ¶ 9.) In 2000, she was promoted to the position of supervisor in the Assignment Provisioning Center ("APC"), which is responsible for assigning service orders to the appropriate network telephone facility. (Id. ¶ 10; Francisco Dep. at 13.) From approximately 2004 to August 13, 2010, Don Albert ("Albert") was the APC's Director. (Albert Dep. at 232-33.) Throughout Francisco's tenure as a supervisor, Albert was in charge of the APC office in which she worked. (Id. at 233-34; Francisco Dep. at 12-13.) However, Francisco reported to four different managers during four separate periods, including Debra Nuckles ("Nuckles") from November 2003 to March 2008. (Id.; Answer ¶¶ 11, 12; Def.'s Init. Disclosures at 1-2.)

In October 2007, Albert hosted a management conference at Virginia Beach, Virginia, for his entire team of first and second level managers, including those in the APC. (Francisco Dep. at 154.) Francisco was among those in attendance. (Id. at 157.) During the conference, Albert "asked for a volunteer from the audience to assist him." (Id. at 155.) McNeil, also a supervisor, volunteered. As Albert recited one of the group's accomplishments for the year, and pointed to her, McNeil lifted up a placard containing various sound effects (*i.e.* Applause, "Hooray," "Yippee," *etc.*) and "whatever it said is what the audience was to do." (Id. at 155-56.)

In creating the cue cards for the October 2007 conference, Albert reused the back side of a set of used cue cards which he had previously utilized during a meeting with the second level managers from the APC.  (Albert Decl. ¶¶ 23, 24.)  At the prior meeting, he announced that he would be escorting those in attendance to see the production of *The Phantom of the Opera* as a reward for good results during the previous quarter.  (Albert Dep. at 242-43; Albert Decl. ¶¶ 23, 24.)  At the meeting with the second level managers, he used the cue cards to display visual clues for *The Phantom of the Opera*, including images of an elephant, a monkey, a boat, a revolver, a policeman, and a noose.  (Id. at 243.)  As he was preparing his presentation for the subsequent, October 2007 conference, and just prior to leaving from his office in to attend the conference, Albert decided to use audience commands during his presentation.  Because he "was basically cheap and . . . was in hurry and they were available," Albert placed the audience commands on the reverse side of the *Phantom of the Opera* used cue cards.  (Id. at 244.)

At the conference, McNeil "ceremoniously discard[ed]" each cue card after she held it up. (Id. at 245.)  When she "pitched" the card with the noose on the reverse side, the noose was revealed to some members of the audience, including Francisco.  (Id.)  As Francisco testified, "[w]hen she picked it up quite obviously it was on the wrong side . . . ."  (Id. at 156.)  McNeil was not instructed to show the noose.  (Id. at 161.)  Although she was offended by the image, Francisco did not raise her concerns during the conference, or at any other time in 2007. (Amended Complaint ¶¶ 36-37; Francisco Dep. at 169-70.)  Likewise, no one else in the audience that day, including McNeil, ever complained to Verizon about the noose image.  (Albert Decl. ¶ 27; Ashley Decl. ¶ 11.)

As Director of the APC, Albert was responsible for identifying the appropriate candidate

in his organization for any "reductions in force" ("RIF"), with Verizon's human resources and legal departments responsible for approving his decision.  (Albert Decl. ¶ 7; Albert Dep. at 264-65.)  In late 2007, after two other supervisors were selected for a RIF in his organization, Albert expected that another RIF was inevitable.  (Albert Dep. at 264-65.)  Therefore, Albert began to consider what reductions, if any, he might have to make in the future.  (Id. at 265.)  At that time, he determined that Francisco would be the most appropriate candidate for the next RIF if told to reduce his supervisor headcount.  (Id. at 261-64.)

Albert identified Francisco as an appropriate employee to RIF for two reasons.  First, he had decided that the RIF should involve either the Woodbridge, Virginia, or Silver Spring, Maryland APC offices, and Francisco was employed at the Woodbridge location.  (Albert Dep. at 264:9-13.)  Between those two offices, Albert preferred to terminate an employee at the Woodbridge location because it had the lower ratio of supervisors to staff, and because the Silver Spring location was responsible for certain critical functions that Woodbridge was not.  (Id. at 266:22-267:8.)  Secondly, between the two supervisors at the Woodbridge location, and even among those at the Silver Spring location, Francisco had experienced the lowest performance rating in several evaluation categories -- "developing."  (Id. at 267:4-8; Francisco Dep. 88:9-11.)

During the first two weeks of January 2008, Albert officially received the directive to reduce his supervisory staff by one employee. (Albert Decl. ¶ 9.)  Upon receiving the confirmation, Albert made the preliminary decision to recommend that Francisco be the supervisor selected for the next RIF. (Albert Dep. at 266-67.)  He did not, however, finalize his decision until February 4, 2008.  (Id. at 282:24.)  Also during the first two weeks of January 2008, and as part of the RIF process, Albert solicited input from Nuckles concerning his initial

selection of Francisco.  (Id. at 267-69.)  Nuckles provided her input, concurring in Albert's

decision to RIF Francisco.  (Id. at 212:14-25, 226:6-16.)  Although Nuckles provided her input,

the ultimate decision still "fell upon" Albert, in conjunction with Verizon's human resources and

legal departments.  (Id.)[6]

Between January 15 and 17, 2008, Francisco did not report to work.  During a call

between JoAnn Clements ("Clements"), Francisco's co-supervisor at the Woodbridge APC, and

Nuckles on January 15, 2008, Clements inquired whether Francisco had notified Nuckles that she

would be absent.  Francisco had not. (Nuckles Decl. ¶ 23.)  Following the call with Clements,

Nuckles unsuccessfully attempted to reach Francisco by calling her cell phone number and

emergency contact numbers, leaving a message for Francisco on her cell phone.  (Id. ¶ 24.)  By

the afternoon of January 17, 2008, Nuckles had not heard from Francisco in three days, and she

therefore referred the matter to Verizon Security.  (Id. ¶ 27.)

Louise Shutler ("Shutler"), a corporate security investigator for Verizon, interviewed

Francisco on January 24, 2008, in her investigation of Francisco's failure to report to work

between January 15 and 17, 2008 .  (Shutler Dep. at 33.)  During their meeting, Francisco told

Shutler that she was absent because she needed to travel to Pittsburgh, Pennsylvania in response

to a family emergency. (Id.)  Francisco later admitted that such an excuse was not true, and that

she never went to Pittsburgh for any family emergency during the period.  (Francisco Dep. 85:22-

24, 86:2-10.)

_____

[6]Contrary to Francisco's statement in her opposition brief, Nuckes did not "repeatedly
den[y] having anything to do with Albert's decision."  (Pl.'s Br. Opp'n Mot. Summ. J. at 4.)
Rather, she testified consistently that she provided only informal input to Albert, who in turn
made the ultimate decision.  (Nuckles Dep. at 212:14-25, 226:6-16.)  Nuckles simply did not
claim that she participated in the formal decision-making process.

It was during Shutler's January 24, 2008 interview that Francisco, for the first time, voiced her concerns about the noose image that was displayed at the October 2007 conference. (Francisco Dep. at 197-98; Amended Complaint ¶¶ 36-37; Second Amended Ans. ¶¶ 36-37.) Francisco also alleged that she had previously been receiving inadequate pay and that Clements, her co-worker, was receiving better work assignments despite Francisco's seniority. (Francisco Dep. at 180-86.) Upon receiving Francisco's allegation, Shutler advised Francisco that Verizon security investigators do not investigate allegations of EEO violations, but that she would refer Francisco's allegation to the appropriate office. (Francisco Dep. at 214.)

Prior to making her complaint to Shutler, Francisco had never complained about any racial discrimination occurring during her employment with Verizon. (Francisco Dep. at 170:22-24.) In fact, she testified during her deposition that she did not believe that any of the managers that she reported to, including Nuckles, ever discriminated against her based on her race. (Id. at 97:20-98:10.) In addition, Francisco testified that she has "never spoken with Don Albert." (Id. at 232:20-23.)

Based on the information available to her at the time, Shutler was unable to conclude that Francisco's stated explanation for her failure to report to work was false. Accordingly, she determined that the matter was not one for further attention by Verizon Security and, therefore,

she referred the issues of Francisco's absence back to Nuckles. (Shutler Dep. at 138-39.)[7]

On January 25, 2008, Nuckles met with Francisco to address her failure to report to work for the three days. (Nuckles Decl. at Ex. I.) During the meeting, Francisco apologized for her absence, but offered no explanation for her failure to notify anyone of her intentions. (Id.) On February 4, 2008, Albert submitted his decision to terminate Francisco. (Id. at 263; Albert Decl. at Ex. B.) At the time, Albert had no knowledge that Francisco had made any complaint about the Noose Incident. (Albert Decl. ¶ 21; Nuckles Decl. ¶ 34; Shutler Dep. at 121.)[8] On February 7, 2008, Francisco contacted Shutler to get a status update regarding her complaint. Shutler told Francisco that she had forgotten to refer the complaint, but that she would do so immediately thereafter. (Amended Ans. ¶¶ 39-42; Second Amended Ans. ¶¶ 39-42.)[9]

---

[7]Based on Shutler's deposition testimony, she may have discussed the Noose Incident with Nuckles as early as January 24, 2008 -- the same day as her interview with Francisco. (Shutler Dep. at 157:17-158:2.) The parties dispute whether Shutler misspoke, stating the name "Nuckles" when she meant to say "Francisco." (Shutler Dep. at 158:7-8.) Although Ms. Shutler retracted her statement during deposition and indicated that she had, indeed, misspoken, this would present an issue of fact for a jury to resolve, should that fact be deemed material. Therefore, for purposes of resolving the motion for summary judgment, the Court assumes that Nuckles learned about Francisco's complaint involving the Noose Incident on January 24, 2008 -- the same day that Shutler interviewed Francisco.

[8]Francisco cites a cryptic, handwritten note of Ashley's to suggest that there was a prior conversation in which Ashley told Albert about the complaint surrounding the Noose Incident. (Pl.'s Br. Opp'n Summ. Judgment at 18-19.) There is no reference to Albert in the notes and the date, if any, is March 6, 2008. The notes alone cannot, therefore, support any inference that Albert learned about the incident on or before his final decision to terminate Francisco on February 4, 2008.

[9]There is some dispute over whether Shutler promised to report Francisco's complaint to "local management," the Ethics office, or Verizon's EEO compliance department. (Compare Amended Ans. ¶ 39 with Second Amended Ans. ¶ 39.) Shutler's promise is immaterial; rather, it is material only to whom Shutler actually, subsequently reported the complaint -- namely, Keena Ashley of Verizon's EEO compliance department.

On February 13, 2008, Keena Ashley ("Ashley"), a Verizon EEO investigator, first learned about Francisco's complaint surrounding the Noose Incident. (Ashley Dep. at 89:19-20, 141:5-15; Pl.'s Br. Opp'n Mot. Summ. Judgment Ex. 9.) Investigation of the Incident was formally assigned to her on February 18, 2008. (Ashley Decl. ¶ 4.) The next day, Ashley interviewed Francisco about her allegations. (Ashley Decl. ¶ 5; EEO Investigation File, attached as Ex. A to Ashley Decl.; Francisco Dep. at 195.) During the interview, Francisco alleged that her co-worker, McNeil, accidentally dropped the cue-card containing the image of a noose. (Ashley Decl. at Ex. A; Francisco Dep. at 195-97.) Francisco acknowledged to Ashley that she had not previously heard Albert make any statements that were racial in nature, as she was not in his company often. (Ashley Decl. at Ex. A.)

On February 28, 2008, Albert's proposal to RIF Francisco was approved. (Def.'s Br. Supp. Summ. J. at Ex. 9.) At that time, Francisco was the only person selected for such a RIF. (Second Amended Ans. ¶ 9.) On March 6, 2008, Verizon officially notified Francisco of its decision, giving her thirty days to identify another position within Verizon to which she could be transferred. (Amended Compl. ¶ 9; Second Amended Ans. ¶ 9.) On March 11, 2008, Ashley contacted Albert and advised him, for the first time, that she had received a complaint from Francisco concerning the Noose Incident. (Ashley Decl. at Ex. A; Albert Decl. ¶ 28; Ashley Decl. ¶ 8.)

## B.    Standard of Review

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The relevant inquiry in a summary judgment analysis is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). In reviewing a motion for summary judgment, the Court must view the facts in the light most favorable to the non-moving party. Id. at 255.

Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. Anderson, 477 U.S. at 247-48 (emphasis in original). Indeed, summary judgment must be granted if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To defeat an otherwise properly supported motion for summary judgment, the nonmoving party must rely on more than conclusory allegations, "mere speculation," the "building of one inference upon another," the "mere existence of a scintilla of evidence," or the appearance of some "metaphysical doubt" concerning a material fact. Lewis v. City of Va. Beach Sheriff's Office, 409 F. Supp. 2d 696, 704 (E.D. Va. 2006) (citations omitted). Of course, the Court cannot weigh the evidence or make credibility determinations in its summary judgment analysis. Williams v. Staples, Inc., 372 F.3d 662, 667 (4th Cir. 2004).

Furthermore, a "material fact" is a fact that might affect the outcome of a party's case.

26

Anderson, 477 U.S. at 247-48; JKC Holding Co. LLC v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; see also Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001). A "genuine" issue concerning a "material" fact only arises when the evidence, viewed in the light most favorable to the non-moving party, is sufficient to allow a reasonable jury to return a verdict in that party's favor. Anderson, 477 U.S. at 248.

## C. Discussion

Francisco's claim is based solely on her allegation that Verizon retaliated against her in violation of Title VII for engaging in protected activity, namely, complaining about the Noose Incident. (See Am. Compl. ¶¶ 58-73.) To succeed on a retaliation claim, a plaintiff must first establish a *prima facie* case of retaliation by showing: (1) that the plaintiff was engaged in protected activity; (2) that the employer acted adversely against the plaintiff; and (3) that the protected activity was causally connected to the adverse action. Laughlin v. Metro. Washington Airports, 149 F.3d 253, 258 (4th Cir. 1998). If the Plaintiff establishes such a case by circumstantial evidence, the court must then analyze the claim for retaliation pursuant to the McDonnell Douglas burden-shifting scheme. Id. (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973)). If a plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its action. Id.

Verizon moves for summary judgment on four separate grounds. First, challenging the Plaintiff's *prima facie* case, Verizon argues that Francisco's complaints, made on January 24,

2008, did not constitute "protected activity."  (Def.'s Br. Supp. Mot. Summ. J. at 19-24.)

Second, also with respect to the Plaintiff's *prima facie* case, Verizon argues that there is no

causal connection between Francisco's complaints and her termination and, therefore, her

termination could not have been the result of unlawful retaliation.  Third, assuming that

Francisco established a *prima facie* case, Verizon argues that the undisputed evidence shows that

it had legitimate, non-discriminatory reasons for terminating Francisco.  (Id. at 27-29.)  Finally,

Verizon contends that "after-acquired evidence" provides legitimate grounds for termination.

(Id. at 29-30.)

Because the causation element is uniquely impacted by the time-line in this case, the

Court begins its analysis with that issue.  See Peters v. Jenney, 327 F.3d 307, 314 (4th Cir. 2003)

("failure to produce evidence sufficient to permit a jury to find for the nonmovant plaintiff as to

*one of the elements* of his cause of action renders all other issues of fact immaterial) (citing

Celotex Corp. V. Catrett, 477 U.S. 317, 323 (1986)).

**(1)       The Undisputed Record Fails to Establish Causation**

Francisco asserts two evidentiary theories in support of her retaliation claim.  First, she

argues that there is direct evidence of retaliation.  (Pl.'s Br. Opp'n Summ. Judgment at 17-19.)

Second, she argues that she meets the requirements of the burden-shifting scheme of McDonnell

Douglas Corp. v. Green, 411 U.S. 792 (1973).  Either theory requires Francisco to establish

causation.  See Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 67 (2006); Lettieri v.

Equant, Inc., 478 F.3d 640, 650 (4th Cir. 2007).

A key difference between these two theories, however, is that circumstantial evidence

may be used to prove causation in the McDonnell Douglas burden-shifting context.  Peters, 327

F.3d at 320 n.15 (citations omitted). Circumstantial evidence may be established by close temporal proximity, whereby the adverse employment action occurs shortly "*after* her employer became aware that she had filed a discrimination charge." Williams v. Cerberonics, 871 F.2d 452, 457 (4th Cir. 1989) (emphasis added). Such proof, although not conclusive, "certainly satisfies the less onerous burden of making a *prima facie* case of causality." Id.; see also Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994). Significantly, the employer's "[k]nowledge of a charge is essential to a retaliation claim." Causey v. Balog, 162 F.3d 795, 803 (4th Cir. 1998) (citation omitted). Here, however, neither the Plaintiff's direct-evidence theory, nor the McDonnell Douglas burden-shifting analysis, can overcome the undisputed timeline which indicates that the decision to terminate Francisco was made *before* the decision-makers knew about Francisco's complaint.

Francisco's direct evidence theory is based upon a series of unreasonable inferences that she draws from a vague, incomplete set of handwritten notes. (Pl.'s Ex. 8.) Although the document is marked "3/6/0," Francisco argues that it might have been created before March 6, 2008. (Pl.'s Br. Opp'n Summ Judgment at 17 n.3.) Francisco then extrapolates from the note that it is proof of a conspiracy between Albert and Ashley to terminate Francisco on the basis of race. (Id. at 18-19.) The note contains absolutely no indicia that it reflects a conversation with Albert. Moreover, the only logical inference that can be drawn about the date is that the notes were written, at the earliest, on the day of March 6, 2008 -- the date apparently referred to on the note. Thus, there is absolutely no evidence that Albert and Ashley "hatched" a conspiracy to terminate Francisco because of her race, and any argument to the contrary is nothing more than rank speculation.

29

As for Francisco's circumstantial case, it turns solely on the undisputed timeline of events. According to Verizon, the decision to terminate Francisco was made in early January, and neither Albert nor Nuckles learned about Francisco's complaint concerning the Noose Incident until March 11, 2008. Francisco challenges the timeline by "fast-forwarding" in time the date on which the final decision to terminate her was made, and "shifting-backward" in time the date on which Albert and Nuckles learned of the Noose Incident complaint. To that end, Francisco has arguably established the date on which *Nuckles* learned of the complaint to be January 24, 2008, and she arguably establishes the date on which *Albert* made the final decision to terminate Francisco to be February 4, 2010.

That timeline nevertheless falls short of establishing that the decision-makers at Verizon knew about Francisco's complaint when she was selected for the RIF. According to the undisputed evidence, Albert was responsible for selecting a supervisor for the RIF, then submitting his selection to Verizon's human resources and legal departments for final approval. During the first two weeks of January, he solicited input from Nuckles to confirm his decision. Even if the Plaintiff is correct that Nuckles learned about the complaint in late January, that event still occurred *after* Nuckles provided her input to Albert.

Indeed, Albert finalized his decision no later than February 4, 2008. The undisputed evidence establishes that Albert did not know about Francisco's complaint on or before that date. At the earliest, Albert may have learned about Francisco's complaint on March 6, 2008 -- over one month *after* he submitted his recommendation. Moreover, even if Nuckles knew about the complaint as of January 24, 2008, there is not a scintilla of evidence that she shared such information with Albert or otherwise provided additional input to Albert. Therefore, given the

undisputed parameters of the correct timeline, Francisco cannot establish that Albert knew about the Noose Incident complaint when he recommended Francisco for the RIF on February 4, 2008.

Verizon's human resources and legal departments approved Albert's recommendation to RIF Francisco on February 28, 2008. There is no evidence that, between February 4 and February 28, any other person involved in the decision to terminate Francisco ever learned about her complaint involving the Noose Incident. Simply put, Francisco cannot establish that any decision-makers at Verizon knew about her complaint *before* making their decision to terminate her employment, and the Court must therefore grant summary judgment in favor of Verizon on such a basis.

### (2) Francisco Did Not Engage in "Protected Activity"

As an additional basis for granting summary judgment, the Court finds that Francisco was not engaged in "protected activity," as required to establish a claim for unlawful retaliation. The "Noose Incident" was a single, isolated situation in which a prop from an earlier presentation was taken out of context. To constitute "protected activity," a plaintiff must "*reasonably believe*[]" that the employment practice is unlawful. Jordan v. Alternative Resources Corp., 458 F.3d 332, 338 (4th Cir. 2006) (emphasis in original). Because such an analysis is "an objective one, the issue may be resolved as a matter of law." Id. at 339.

Where a retaliation claim is based on the employee's complaints about a hostile work environment, a single incident is insufficient to create a "an objectively reasonable belief" that a violation of Title VII was actually occurring. Id. at 341. Such a principle exists because such complaints do not involve even a discrete adverse employment action. "[O]nly after an accumulation of discrete instances of harassment" can such conduct rise to the level of an

unlawful employment practice.  Id. at 339.

Here, the Noose Incident was a single, isolated incident that was taken out of context. Indeed, Francisco waited three months before reporting the incident, with no additional complaints of racism by her in the meantime.  Her complaint to Shutler about the Noose Incident was the first time Francisco ever raised any concerns about racism at Verizon during her ten years of employment with the company.  (Francisco Dep. at 170:22-24.)  Indeed, Francisco even admitted that she did not believe that her direct supervisor harbored any racial animus, and that she had no additional knowledge of any such hostility maintained by Albert.  (Id. at 97:20-98:10, 232:20-23.)  And unlike the facts of Jordan, 458 F.3d at 339-40, in which a co-worker's hateful comments were undisputably "crude and racist," there is no evidence to dispute the benign character of the noose in this case.  The noose image was nothing more than a reference to *The Phantom of the Opera* with no image of a person, let alone one of African American heritage, included.  As counsel for Verizon noted at oral argument on the motions, Francisco asserts, in essence, that any image of a noose, no matter how innocuous, creates a hostile work environment. (See also Francisco Dep. at 251:13-15 ("It was wrong to have a noose").)

At oral argument, Francisco attempted to challenge the notion that the Noose Incident was the sole basis for her retaliation claim.  Submitting her EEOC Charge as additional evidence for the record, Francisco argued that her complaint also included allegations that she was denied opportunities for advancement, and that her superiors forced her to assume lesser duties on account of her race.  Verizon objected that the EEOC Charge constituted hearsay.  In addition, courts in other circuits have found such documents inadmissible as consisting of hearsay and as tending to be overly confusing and unfairly prejudicial.  See, e.g., Williams v. Nashville Network,

132 F.3d 1123, 1129 (6th Cir. 1997). Here, whether the document is part of the record is immaterial. The EEOC Charge was made on October 6, 2008, nearly seven months after Francisco's termination. Thus, the document provides no evidence of what Francisco was actually alleging when she first raised her concerns to Verizon in late January 2008.

Moreover, as Francisco herself admitted, "the nature of [her] complaint is not with Debra Nuckles or racism . . . [it] is that Don Albert had that noose." (Francisco Dep. at 185:5-8, 251:18-21.) Francisco cannot now enhance her position by adding an additional basis for her complaints after the alleged retaliation actually occurred. Moreover, her alleged complaint about disparate pay in 2006 was rendered moot by the increase in salary that Francisco received in November 2006. (Def.'s Reply Supp. Mot. Summ. J. at Ex. 12.) Indeed, Francisco has not disputed that both Nuckles and Alberts undertook efforts to increase her salary to a level commensurate with other employees. (Def.'s Reply at 17-18.)

It is also significant that for three months, Francisco failed to voice her concerns about potential racial hostility that such a symbol as the noose might reasonably evoke. Francisco raised her concerns only after she was the subject of an investigation for her failure to report to work for three days without explanation. She testified that she knew of Verizon's anonymous hotline for reporting discrimination in the workplace, but she admittedly chose not to utilize it. (Francisco Dep. at 170:6-24.) There is simply no evidence in the record explaining why Francisco waited until she herself was the subject of an investigation to raise her concerns.[10] Such a delay is further

---

[10]At oral argument, counsel for Francisco explained the delay based on a fear of retaliation. There is simply no evidence in the record that Francisco feared retaliation, and she admitted that she knew of no specific example of same at Verizon. (Francisco Dep. at 170:22-171:22.) Moreover, Francisco's supposed fear of reprisal did not prevent her from being absent, "without leave," for three days without permission.

evidence that she did not hold an objectively reasonable belief that the Noose Incident created a hostile work environment.

Certainly, the image of a noose, in the right context, could be persuasive evidence of racial animus. But here, where there is only a single incident involving an otherwise innocuous image referencing the play, *The Phantom of the Opera*, no reasonable person could believe that Verizon was maintaining or permitting a hostile work environment to exist. Thus, Francisco fails to establish her *prima facie* case of retaliation on such a basis, and summary judgment is therefore appropriate on that additional basis.

### (3) Verizon's Legitimate, Non-Discriminatory Reason is Undisputed

Even if Francisco could establish a *prima facie* case of unlawful retaliation, Verizon would still be entitled to summary judgment because its stated non-discriminatory basis for the RIF decision is undisputed. Where an employer gives a legitimate, non-discriminatory reason for discharging the plaintiff, "it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." Hawkins v. Pepsico, Inc., 203 F.3d 274, 278 (4th Cir. 2000) (internal quotation marks omitted). Here, Verizon's stated reasons for terminating Francisco have been consistent, and are undisputed.

The record further establishes that Albert chose to RIF Francisco because she was the only employee among a pool of five employees considered to receive substandard "developing" ratings. (Albert Dep. at 267:4-8; Francisco Dep. at 88:9-11.) "Job performance and relative employee qualifications are widely recognized as valid, non-discriminatory bases for any adverse employment decision." Evans v. Tech. Applications & Serv. Co., 80 F.3d 954, 960 (4th Cir. 1996) (citing Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 258-59 (1981)).

Francisco attempts to challenge the wisdom or accuracy of Verizon's choice by demonstrating that her "work unit rating was the second highest of all of Nuckles' supervisors." (Pl.'s Br. Opp'n Mot. Summ. J. at 26, Ex. 22.) She further argues that her co-worker, Clements, testified that she would consider that measure to be the single most significant measure of performance. (Clements Dep. at 33:21-34:5.) Such an argument is to no avail. Albert's stated reason is undisputed, and whether he would have been wiser to base his selection on a different measure is of no consequence. The Court cannot consider whether the employer's actions were accurate or wise. Hawkins, 203 F.3d at 278.

Francisco fails to establish a *prima facie* case of retaliation. But even if she had established a *prima facie* case, Verizon would nonetheless be entitled to summary judgment because its stated legitimate, non-discriminatory basis for terminating Francisco is undisputed.

### (4)     After-Acquired Evidence Precludes Relief

Assuming that Francisco could otherwise meet her burden, Verizon also argues that Francisco's "lies" about her three day hiatus bars any recovery pursuant to the "after-acquired evidence doctrine." (Def.'s Br. Supp. Mot. Summ. J. at 29 (citing McKennon v. Nashville Banner Publ. Co., 513 U.S. 352, 363 (1995).) As Francisco argues, however, Verizon's argument goes further than the rule allows, because the "after-acquired evidence doctrine" does not provide a complete bar to recovery. McKennon, 513 U.S. at 362-63. The rule merely limits the "calculation of backpay from the date of the unlawful discharge to the date the new information was discovered." Id. at 362. Moreover, it requires the defendant to "establish that the wrongdoing was of such severity that the employee *in fact* would have been terminated on those grounds alone." Id. at 362-63 (emphasis added).

Francisco may have innocently changed her story, initially indicating that a family emergency called her to Pittsburgh, Pennsylvania, while later acknowledging that she never left Virginia during that period. (Francisco Dep. at 86:2-87:3.) Indeed, she maintains that she does not remember telling Shutler that she traveled to Pittsburgh, although her statement may have questionable weight where she also stated that "[i]f that is something she can prove to me beyond a shadow of a doubt, then I would go with that." (Francisco Dep. at 86:24-87:2.) In any event, such arguments of weight are not properly resolved on summary judgment, and are left to the factfinder. See Williams, 372 F.3d at 667.

Likewise, it is unclear whether Verizon's declaration evidence establishes that Francisco would have, *in fact,* lost her job for the alleged transgression. Such evidence merely asserts that Nuckles and Albert would have "recommended" such a termination, but it does not conclusively establish that it would have actually resulted in termination. (Nuckles Decl. ¶ 32; Albert Decl. ¶ 29.) As with Francisco's testimony, such a dispute of fact over whether Francisco lied, and how Verizon would have responded, would have properly been a question for a jury. However, the question will remain unanswered, as Francisco has not presented sufficient evidence, as a matter of law, to present her case for a jury's consideration.

## IV. Conclusion

For the reasons discussed herein, the Court hereby DENIES Plaintiff's motion for sanctions, Plaintiff's motion to strike exhibits, Defendant's motion for a protective order, and Defendant's motion in limine. The Court hereby GRANTS Defendant's motion for leave to amend its answer, and Defendant's motion for summary judgment.

An appropriate Order shall issue.

_____/s/_____
Dennis W. Dohnal
United States Magistrate Judge

Richmond, Virginia
Dated: November 23, 2010